**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**ERICA ALEJANDRA GONZALEZ PORRAS,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No.: 1:23-cv-01195** |
| **-against-** | **SECOND AMENDED COMPLAINT** |
| **IBX CONSTRUCTION, BOLEX GC CORP, ADRIANO CASSIANO RAMOS VERDI, and BORIS BABAKHANOV,** | *Jury Trial Demanded* |
| **Defendants.** | |

-------------------------------------------------------------X

PLAINTIFF ERICA ALEJANDRA GONZALEZ PORRAS, by her attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This action is brought on behalf of Plaintiff, who performed construction work for Defendants on a three-story commercial building located at 136-21 Hillside Avenue, Richmond Hill, NY 11418.

2.      The nature of this action is employment discrimination on the basis of Plaintiff's gender, sexual harassment, hostile work environment, and retaliation for lawful complaints of harassment and discrimination, unequal pay as well as overtime claims in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the New York State Human Rights Law ("NYSHRL"); the New York City Human Rights Law ("NYCHRL"); the New York State Equal Pay provisions of the N.Y. Labor Law

1

("NYLL"), and the overtime and wage provisions of the NYLL.

**THE PARTIES**

3.      Plaintiff Erica Alejandra Gonzalez (hereinafter "Plaintiff") is a female who resides in Queens, New York. Plaintiff was subjected to unlawful discrimination, sexual harassment and retaliation by her joint employers IBX Construction (hereinafter "Defendant IBX"), Bolex GC Corp. (hereinafter "Defendant Bolex"), Adriano Cassiano Ramos Verdi (hereinafter "Defendant Verdi"), and Boris Babakhanov (hereinafter "Defendant Babakhanov")(collectively, the "Defendants").

4.      Plaintiff is and was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant Federal, State, and local laws.

5.      Plaintiff speaks Spanish only, and does not speak English.

6.      Upon information and belief, at all times herein, Defendant IBX was and is a corporation registered in New York and permitted to do business in New York, and is engaged in the construction industry

7.      Defendant IBX is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the New York State Human Rights Law, the New York City Human Rights Law, the New York Labor Laws, and the New York State Equal Pay Act.

8.      At all times herein, Defendant Bolex was and is a corporation registered in New York and permitted to do business in New York and is engaged in the construction industry. Its headquarters are located at 185-08 Union Turnpike, Suite 106, Fresh Meadows, NY 11366.

9.      Defendant Bolex was the general contractor for the building located at

2

136-21 Hillside Avenue, Richmond Hill, New York 11418 (hereinafter the "Hillside Site").

10. Upon information and belief, in or around 2019, Defendant Bolex entered into a contract with Defendant IBX to perform framing services on the Hillside Site.

11. Defendant Bolex is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the New York State Human Rights Law, the New York City Human Rights Law, the New York Labor Laws, and the New York State Equal Pay Act.

12. Upon information and belief, Defendant Verdi was and is the owner of Defendant IBX.

13. At all times relevant Defendant Verdi was Plaintiff's employer and had the ability to affect the terms and conditions of Plaintiff's employment.

14. Defendant Verdi speaks Spanish and English.

15. Defendant Babakhanov was and is the owner of Defendant Bolex.

16. At all times relevant Defendant Babakhanov was Plaintiff's employer and had the ability to affect the terms and conditions of Plaintiff's employment.

17. Upon information and belief, Defendant Babakhanov speaks Russian and English, but does not speak Spanish. This belief is based upon the fact that Plaintiff heard him speak English, but not Spanish, and other employees confirmed this belief to her.

18. Upon information and belief, Defendants Bolex and IBX were joint employers or a single employer of Plaintiff, because, they both had employees and/or owners with regular work locations at the Hillside Site and those employees and/or owners monitored Plaintiff's work and were involved in tracking Plaintiff's time and attendance

and approving her pay; they were both responsible for the safety of the employees and the legal compliance of the work done on the construction site; and they both had knowledge of Defendant Verdi's efforts to sexually harass Plaintiff and retaliate against her for her refusal to submit to his advances by altering the terms and conditions of her employment (demoting and then firing her) as well as by docking her pay.

19.     Plaintiff anticipates that discovery will provide the further evidence needed to establish the joint or single employer status of Defendants Bolex and IBX because all of that evidence, including the subcontract between Bolex and IBX outlining the scope of Defendant IBX's work, is within Defendants' exclusive control, and she does not possess such evidence or definitive information.

## ADMINISTRATIVE PREREQUISITE

20.     On or about December 23, 2020, Plaintiff filed a Charge of Discrimination against Defendants IBX and Bolex. On or about April 21, 2022, Defendant Bolex submitted a    position statement in opposition to the EEOC.  On or about July 5, 2022, the EEOC issued Plaintiff her right to sue.

## FACTUAL BACKGROUND

### Plaintiff is Hired to Work for Defendants

21.     On or around December 13, 2019, Plaintiff visited the Hillside Site to inquire about possible employment. Plaintiff had some construction experience and was looking for a job to help support her family.

22.     At the Hillside Site, Plaintiff spoke with Patricio Blacio (hereinafter "Coworker Blacio") who was performing labor at the Hillside Site, and informed Plaintiff that Defendants needed someone to help with framing at the Hillside Site. Coworker Blacio

4

provided Plaintiff with the phone number for Owner Adriano Cassiano Ramos Verdi

(hereinafter "Defendant Verdi"), who he indicated was the owner of Defendant IBX.

23.     That same day, Plaintiff messaged Defendant Verdi to inquire about working

at the Hillside Construction Site. Defendant Verdi called Plaintiff back and advised that they

would discuss her potential employment further the following day.

24.     The next day, Coworker Blacio called Plaintiff and told her to return to the

Hillside Site, to speak with Defendant Verdi. Plaintiff returned to the Hillside Site and was

interviewed by Defendant Verdi.

25.     About half an hour after her interview, Defendant Verdi called Plaintiff to offer

her employment, assigning her to work at the Hillside Construction Site. Defendant Verdi asked

Plaintiff to start work on December 16, 2019, at 7:30am. Defendant Verdi advised  that

Plaintiff's starting salary would be $20/hour and that she would be paid in cash. He also

advised that that she would work with Coworker Blacio and that Plaintiff was glad that she

could now help provide for her family and was  grateful for the opportunity to work for

Defendants.

**Plaintiff Begins Working for Defendants**

26.     On December 16, 2019, Plaintiff reported to the Hillside Site for her first day

of work for Defendants.

27.     Upon starting work at the Hillside Site, Plaintiff was not asked to fill out any

employment or tax documents.

28.     For about one month after Plaintiff started working at the Hillside Site,

Defendant Verdi was away on vacation.

29.     In her new role, Plaintiff assisted Coworker Blacio with framing, including

measuring, and cutting the metal used for framing. Since Plaintiff lived close to the Hillside Site, she rode her bike to and from work.

30.     Coworker Blacio introduced Plaintiff to an employee of Defendant Bolex, who he and other employees at the Hillside Site said was Defendant Babakhanov's father. Upon information and belief, Defendant Babakhanov's father is an employee of Defendant Bolex, and speaks Russian and English, but not Spanish.  This belief is based upon the fact that Plaintiff heard him speak English, but not Spanish, and other employees confirmed this belief to her. Upon information and belief, Defendant Babakhanov's father's first name is Abraham. This belief is based upon the fact that he gave Plaintiff his business card which identifies him or his business as "Abraham Driving School."

31.     Each day at the Hillside Site, Plaintiff worked with about ten (10) to twenty (20) co-workers who performed framing services alongside Defendants.

32.     Additionally, each day at the Hillside Site, Plaintiff observed fifteen (15) to twenty (20) laborers, who, upon information and belief, were performing air conditioning and sheet rock work pursuant to contracts between Defendant Bolex and other non-party subcontractors.

33.     Every morning, upon her arrival at the Hillside Site, Plaintiff and the other construction workers were greeted by Defendant Babakhanov.

34.     Additionally, each morning, Plaintiff and the other construction workers were required to check-in with Defendant Babakhanov's father, requiring them to sign an attendance sheet with their names and their individual OSHA numbers.

35.     Upon information and belief, Defendant Babakhanov's father presented the attendance sheets to Defendant Verdi to determine Plaintiff's and her Co-workers pay.

36.     Plaintiff and her Co-workers were paid in cash by Defendant Verdi at the end of each pay-period.

37.     Plaintiff observed that Defendant Babakhanov's father spent the entire day at the Hillside Site.

38.     Additionally, Plaintiff observed that Defendant Babakhanov, and Defendant Bolex's CEO Alex Gill (hereinafter "Bolex CEO Gill"), spent three to four hours each day at the Hillside Site inspecting and monitoring the plaintiffs' and the other construction workers' work and performance.

39.     Upon information and belief, Bolex CEO Gill speaks English, but not Spanish. This belief is based upon the fact that Plaintiff heard him speak English, but not Spanish, and other employees confirmed this belief to her.

40.     Upon information and belief, both Defendant Babakhanov and Defendant Verdi had the power to hire and fire Plaintiff and set the conditions of her employment.

41.     Defendant Babakhanov, Bolex CEO Gill, and Defendant Babakhanov's father used a table set up in the entry way on the first floor of the building on the Hillside Site as a work space. Upon information and belief, their control of the Hillside Site, including the terms and conditions of all construction workers working there, was absolute as Defendant Bolex was the general contractor for the Hillside Site.  They exhibited this control through daily conversations with laborers and managers on the work site, daily inspections of the work being done by all subcontractors, daily monitoring and review of the construction workers' time and attendance, and frequent in-depth conversations with supervisors and managers including Defendant Verdi.

42.     During this period, Plaintiff enjoyed her job with Defendants and was happy

7

to be employed.

**Defendant Verdi Returns from Vacation and Insists that Plaintiff
Ride in His Car with Him**

43.     In or around the week of January 13, 2020, Defendant Verdi returned to work.

44.     Soon after returning to work, Defendant Verdi saw Plaintiff while she was
leaving the Hillside Site to have lunch.

45.     Defendant Verdi, who had been speaking with a foreman named Ricardo
(hereinafter "Foreman Ricardo"), asked Plaintiff how everything was going. She told him that
she was doing fine and went to pick up her lunch. Upon her return, Plaintiff was approached
by Foreman Ricardo, who told her that Defendant Verdi wished to speak with her.

46.     Plaintiff went to Defendant Verdi's car. To her surprise, Defendant Verdi asked
her to take a car ride with him to pick up some paperwork for Foreman Ricardo. Plaintiff
found the request odd and told him that she had not eaten her lunch yet. Foreman Ricardo
joined the conversation. Defendant Verdi insisted that she eat her lunch in his car and made it
clear that she had no choice but to get in the car with him.

47.     When she continued to express reluctance, Foreman Ricardo told Plaintiff that
she had to get in the car and go with Defendant Verdi because he was her boss. Plaintiff felt
that she had no choice but to get into Defendant Verdi's car.

48.     When Plaintiff got in the car, Defendant Verdi asked how she was, and she
replied that she was a bit congested and had a cold.

49.     During the car ride, Defendant Verdi complimented Plaintiff, telling her that he
had heard that she was "a good worker" and that he wanted to make her a foreman of one of
his buildings.

50.     On the way back to the Hillside Site, Defendant Verdi directed Plaintiff to go

home because she was sick. Plaintiff told Defendant Verdi that she felt fine, but he insisted that she should go home, that he would pay her for her full day. When she objected again, he stated, "this is an order."

51.     Defendant Verdi told Plaintiff that he would drive her home but she declined.

52.     Defendant Verdi refused to take no for an answer and continued to insist that he drive her home.

53.     Feeling as if she had no choice, Plaintiff finally acquiesced and gathered her belongings from the Hillside Site, and Defendant Verdi dropped Plaintiff off at her daughter's school despite her obvious reluctance.

### **Defendant Verdi Continues to Insist that Plaintiff Take Car Rides with Him**

54.     A few days after Defendant Verdi drove Plaintiff to her daughter's school, Foreman Ricardo asked her and her co-workers if they had brought lunch. Several employees, including Plaintiff, mentioned that they had not that day. Defendant Verdi then volunteered to buy lunch for everyone and told Plaintiff to ride in his car with him. Again, Plaintiff felt that she had no choice. Notably, Plaintiff did not see Defendant Verdi make her male co-workers take rides with him on demand.

55.     Another day that same week, Defendant Verdi again ordered Plaintiff to drive with him to buy lunch. Plaintiff demurred, telling him that she had brought a sandwich and did not need lunch. Still, Defendant Verdi demanded that she accompany him to buy his lunch. Plaintiff felt that she had to do what Defendant Verdi asked, since he was her boss, so she drove with him to pick up his lunch.

56.     In the car, Defendant Verdi gave Plaintiff $50 to purchase his lunch for

him.

57.     Plaintiff used the money to buy Defendant Verdi's lunch and then returned with the change. Defendant Verdi offered Plaintiff the change, totaling $40, as a "gift" Plaintiff refused the money, but Defendant Verdi told her to take it as payment for her "favor" of getting his lunch for him. Plaintiff continued to try to refuse this "gift", but Defendant Verdi insisted that she take the money.

58.     Defendant Verdi then asked Plaintiff if she was "taken." Plaintiff, increasingly uncomfortable in Defendant Verdi's interest in her, advised Defendant Verdi that she was married and had a child.

59.     Defendant Verdi continued to inappropriately probe into Plaintiff's personal life, asking her how her marriage was going. In an effort to make him realize she was unavailable, she assured him that her marriage was going well.

### Defendant Verdi Tells Plaintiff He Has Feelings for Her

60.     On or around January 22, 2020, Plaintiff asked Defendant Verdi if she could leave work early to file her taxes. Defendant Verdi immediately seized upon the opportunity and announced that he would drive her to do her taxes. Plaintiff tried to decline, but as usual, Defendant Verdi demanded that he drive her.

61.     On the drive to file Plaintiff's taxes, Defendant Verdi told Plaintiff that he had feelings for her and wanted to be in a relationship with her.

62.     Plaintiff was shocked and mortified by Defendant Verdi's romantic advances. She reminded Defendant Verdi that she was married and told Defendant Verdi that she only wanted to work with him and was not interested in a relationship with him.

63.     Defendant Verdi continued to say that he wanted to be with Plaintiff and told

her that she was "always on his mind."

64.    Plaintiff repeated that she was not interested in a relationship and that she simply wanted to do her job. She also told Defendant Verdi that she was Christian and found his advances on her to be wrong since she was married.

65.    Defendant Verdi went on to tell Plaintiff about issues in his own marriage. He promised that if Plaintiff got into a relationship with him, she would receive money and gifts. Plaintiff could not believe that Defendant Verdi was making such blatantly inappropriate offers and was horrified to be trapped in the car with him.

66.    Again, Plaintiff clearly stated that she was not interested in a relationship with Defendant Verdi and reminded him that she was a married woman. She told Defendant Verdi that in all of her thirteen years of work, she had never had a personal relationship with a coworker and that she had no desire to be involved with him.

67.    Defendant Verdi then asked Plaintiff to give him a hug. Plaintiff was disgusted and declined. Shockingly, Defendant Verdi then began to beg Plaintiff to hug him. Since she was trapped in a car alone with him and was afraid of what he would do to her if she did not acquiesce, Plaintiff eventually gave Defendant Verdi a quick hug.

68.    After this incident, Plaintiff was stunned and appalled. She did not feel comfortable working with Defendant Verdi but decided that she needed to keep her job with Defendants, which she still relied on to support her family.

**Defendant Verdi Announces that Plaintiff is "In Charge"**

69.    On or around January 23, 2020, Defendant Verdi called the workers together and made the announcement that Plaintiff was now "in charge" of everyone, which was news to Plaintiff.

70.     Defendant Verdi had not discussed this "promotion" with Plaintiff prior to the announcement, so she was surprised and confused. Plaintiff was tentatively grateful for the new role and was excited to tell her family about it.

71.     Starting that day, Plaintiff was in charge of supervising all of the other employees.

**Defendant Verdi Sexually Harasses Plaintiff**

72.     After Plaintiff's promotion, Defendant Verdi's harassment became more frequent and severe.

73.     On or around January 27, 2020, Defendant Verdi approached Plaintiff and again told her that he wanted a relationship with her. Plaintiff was scared and reiterated that she only wanted to work together.

74.     Later that week, Defendant Verdi asked Plaintiff to look at something with him for work. He then had her follow him up a set of stairs where other people could not see them. Halfway up the stairs he grabbed her and squeezed her so tight she could not move, as he tried to kiss her, but she moved her head.

75.     Terrified, Plaintiff begged Defendant Verdi to please respect her and told him that she only wanted to work.

76.     Defendant Verdi eventually let go of Plaintiff. She felt violated and shaken by the event.

**Defendant Verdi Continues to Sexually Harass Plaintiff**

77.     Only a few days after he first tried to kiss her, Defendant Verdi requested that Plaintiff accompany him on a walk and again, stated it was for work purposes.

78.     Although Plaintiff was extremely afraid that Defendant Verdi would harass

her again, she feared that she needed to do as he said, or else her job could be at risk.

79.     Again, Defendant Verdi attempted to forcibly hug and kiss Plaintiff. This time, Plaintiff felt Defendant Verdi push his penis against her leg.

80.     Plaintiff was horrified to be sexually harassed by Defendant Verdi again. She did not reciprocate his advances and firmly asked for him to please respect her and let her do her job. Plaintiff again reiterated that she only wanted to do her job and only viewed him as her boss.

81.     Defendant Verdi became furious and angrily cussed, "puta mierda," an offensive Spanish term, at Plaintiff.

82.     Plaintiff felt helpless, victimized, and very afraid. Since Defendant Verdi was her boss, she did not know who she could turn to for help.

83.     Plaintiff was devastated that Defendant Verdi was requiring her to engage in a romantic and sexual relationship with him as part of her job.

84.     Upon information and belief, Defendant Verdi expected Plaintiff to have sex with him as a reward for promoting her at work.

85.     After these incidents, Plaintiff tried to avoid Defendant Verdi. She delayed interacting with him when he called her over and tried not to engage with him more than necessary.

86.     Plaintiff was terrified of being sexually harassed again and hoped that she could find a way to keep her job and avoid Defendant Verdi's harassment.

87.     Upon information and belief, Defendant Verdi noticed Plaintiff's behavior. He began to ignore Plaintiff at the construction site and blocked her on his phone, even though she was responsible for sending him updates.

**Defendant Verdi Locks Plaintiff in His Car and Harasses Her**

88.　On or around February 6, 2020, Defendant Verdi asked Plaintiff to accompany him to his car to get some materials and tools. Once they were there, Defendant Verdi demanded that Plaintiff get inside the car.

89.　Plaintiff said that she would wait outside of the car, but Defendant Verdi insisted that she get in.

90.　Frightened, Plaintiff obeyed his order and got inside. Defendant Verdi also got inside the car and locked the door. At this point, Plaintiff began to panic and feel increasingly terrified.

91.　Defendant Verdi told Plaintiff that he was holding her hostage and that she was not working for the day. Plaintiff was terrified and asked for Defendant Verdi to let her out, but Defendant Verdi said he was taking her for the day and started driving.

92.　While he was driving, Defendant Verdi told Plaintiff that he could not understand why she did not want to be in a relationship with him and that she "could have everything she wanted" if she was with him.

93.　Although she was panicked and frightened, Plaintiff stated that she did not understand why Defendant Verdi could not respect that she was only interested in working with him. She reminded Defendant Verdi that he was a married man.

94.　Defendant Verdi then stopped the car and held Plaintiff so tightly that she was unable to move. Defendant Verdi tried to kiss Plaintiff, and Plaintiff moved her head to the side and pleaded for him to let her go.

95.　Upon information and belief, Defendant Verdi expected Plaintiff to have sex with him.

96.     After he had finally released her, Plaintiff went back to the construction site, feeling shaken and horrified. Later that same day, Defendant Verdi called Plaintiff on the phone and begged her to be with him. Plaintiff again declined and pleaded for Defendant Verdi to stop harassing her.

### Plaintiff is Not Paid for Two Days Off

97.     After the incident in the locked car, Plaintiff was relieved to have two days scheduled off to get her scaffolding license. Though she should have been paid for the two days pursuant to Defendants' policy and practices, she was not. Upon information and belief, she was not paid as punishment for resisting Defendant Verdi's advances, and this breach of Defendants' policy and practices was done with the knowledge of and at the direction of Defendant Verdi, and with the knowledge of Defendant Babakhanov.

### Defendant Verdi Retaliates Against Plaintiff at Work

98.     After Plaintiff returned to work, Defendant Verdi continued to ignore her work- related phone calls. His tone towards her changed, and he stopped greeting her and treated her very coldly.

99.     Defendant Verdi also began to criticize Plaintiff in front of her coworkers by telling her that she was not doing a good job.

100.    One day, on or around February 10, 2020, Defendant Verdi announced a new policy that anyone without proper equipment would be paid $15 per hour, instead of $20 per hour. Upon information and belief, this alleged new policy was directed at Plaintiff, who Defendant Verdi knew had an issue with her drill.

101.    Upon information and belief, the new "policy" was never enacted.

102.    On February 12, 2020, Plaintiff sent Defendant Verdi a text message because

he had completely stopped responding to her work-related calls. The text was in Spanish and read: "Boss, I understand you don't want to talk to me, I was calling you to inform you what the chirra [sheetrock] boys were requesting, but if that bothered you, excuse me, only my calls are from work, I don't know if you're upset because I didn't want to be your girlfriend or have a relationship with you? Ok, I don't know anyway and Naza is going to keep an eye on the staff and everything about work, thanks for everything."

103.    Upon information and belief, Defendant Verdi was purposefully ignoring Plaintiff because she had asked him to stop harassing her.

104.    Upon information and belief, Defendant Verdi was ignoring Plaintiff as purposeful retaliation for her rejecting his advances, and he knew that ignoring her would make it impossible for her to perform her job.

**Plaintiff is Demoted**

105.    On or around February 20, 2020, Plaintiff was demoted. Defendant Verdi hired a new employee named Jane Doe (hereinafter "Coworker Doe") and announced that Coworker Doe was now in charge, instead of Plaintiff. He directed everyone to begin reporting to Coworker Doe.

106.    Upon information and belief, this demotion was in retaliation for Plaintiff refusing Defendant Verdi's sexual advances.

107.    It was rumored among the other employees that Coworker Doe and Defendant Verdi were involved in an affair.

108.    Plaintiff was distraught and humiliated. She had been proud to tell her family about the promotion and was now devastated by the demotion, as well as the ongoing sexual harassment that she had already endured. Upon information and belief, she was being

16

demoted because she had refused to have sex with Defendant Verdi.

109.    After Plaintiff asked him about the demotion, Defendant Verdi simply
responded that she was not "tough" enough to manage everyone and that she was not doing a
good enough job

110.    Upon information and belief, Defendant Babakhanov, Bolex CEO Gill, and
Defendant Babkhanov's father knew that Defendant Verdi demoted Plaintiff because she
refused his advances, and put in her place an employee who accepted those advances.

111.    This belief is based upon the fact that Defendant Babakhanov, Bolex CEO Gill,
and Defendant Babkhanov's father had a steady, daily presence at the construction site,
regularly conferred with Defendant Verdi and his employees, and monitored their work.

112.    As the general contractor on the construction site, Defendants Bolex and
Babakhanov undoubtedly had the authority and the duty to correct violations of law that
they observed, including sexual harassment and discrimination against the employees of
Defendants IBX and Verdi whose work they closely monitored and whose pay they
controlled.

**<u>Plaintiff Confronts Defendant Verdi About the Demotion</u>**

113.    Thereafter, on or about February 24, 2020, Plaintiff again approached
Defendant Verdi at work to discuss her demotion.

114.    Plaintiff told Defendant Verdi that she had heard from other people that
Defendant Verdi was saying that she had been demoted for not doing her job right. She went
on to say that she did not think this was true, since she felt she did her job correctly and
always provided Defendant Verdi with updates and photographs.

115.    Defendant Verdi denied saying that Plaintiff was demoted for not doing her

job correctly. Defendant Verdi asserted that he had been contacted by the owner of Defendant Bolex, Defendant Babakhanov, about a ladder that was left behind, and that is why she was demoted.

116.    At no time previously did Defendant Verdi make any attempt to acquaint Plaintiff with any such complaint from Defendant Babakhanov about a ladder left out of place or to investigate the facts behind any such alleged complaint, or indeed, to register any concern with Plaintiff's work performance.

117.    Upon information and belief, Defendant Verdi invented this alleged complaint from Defendant Babakhanov as a pretext for demoting, and later firing Plaintiff, in retaliation for her refusal to accept his sexual advances.

118.    Upon information and belief, Defendant Verdi used Defendant Babakhanov's name in this communication to Plaintiff because Defendant Babakhanov was aware of Defendant Verdi's action demoting Plaintiff and his intention to fire Plaintiff, and the discriminatory and retaliatory reasons for the same, and condoned and endorsed that action and anticipated action and discriminatory and retaliatory reasons.

119.    Plaintiff rejected Defendant Verdi's excuses and told him that she is not the type of woman to sleep with her boss to keep a position. She then pointed out that his refusal to take her calls or respond to her messages made it very difficult for her to do her job.

120.    In response, Defendant Verdi rudely called Plaintiff a "boba," a derogatory Spanish term that indicated that Plaintiff was weak and stupid. Defendant Verdi also pointed out that Coworker Doe was more "experienced" than Plaintiff, which upon information and belief, meant she was smart enough to engage in a sexual relationship with him as part of her job.

121.     Plaintiff, frustrated said, "I know I did an excellent job" and walked away.

### Defendant Verdi Blows Kisses at Plaintiff

122.     Around the beginning of March of 2020, Defendant Verdi started to taunt

Plaintiff by blowing kisses at her while she worked.

123.     Plaintiff was disgusted and offended. She asked Defendant Verdi to please act

respectfully towards her.

### Defendant Verdi Touches Plaintiff Inappropriately

124.     On or around March 7, 2020, Plaintiff was at work wearing ripped jeans over

leggings.

125.     While Plaintiff was cutting metal for framing, Defendant Verdi walked over

and commented that she was wearing ripped jeans and then proceeded to touch Plaintiff's legs

through the holes of her jeans.

126.     Appalled, Plaintiff asked Defendant Verdi to please respect her. Defendant

Verdi walked away, laughing.

127.     After yet another instance of unwanted touching by Defendant Verdi, Plaintiff

became even more stressed and anxious at work. Even after she had seemingly been demoted

for not having a sexual relationship with Defendant Verdi, it felt as if she was still trapped in a

hostile, harassing work environment.

### Plaintiff Confronts Defendant Verdi About His Harassment

128.     On or around March 16, 2020, Plaintiff approached Defendant Verdi at work

and told him that she was upset by his constant harassment and begged him to please stop

harassing her. Plaintiff explained that she respected Defendant Verdi as a boss and was

grateful for the job that he had provided her, but that she had no feelings towards him and

only viewed him as a boss. Plaintiff asked that Defendant Verdi please respect this.

129.    Plaintiff also told Defendant Verdi that it was not okay for him to put his hands on her legs. She repeated that she simply wanted Defendant Verdi to respect her.

130.    By this point, Plaintiff had reached a point of desperation. Plaintiff was extremely stressed and demoralized due to Defendant Verdi's constant harassment. She needed the job but felt miserable at work, since she was in constant fear of being harassed by Defendant Verdi.

## Defendant Verdi Threatens to Fire Plaintiff

131.    On or around March 16, 2020, soon after she had confronted Defendant Verdi, Plaintiff was with her coworker, Nazario Reyes ("Coworker Reyes"). Coworker Reyes realized that he had many missed calls from Defendant Verdi and stepped aside to call Defendant Verdi back.

132.    When Coworker Reyes returned, he told Plaintiff that Defendant Verdi had told him to tell Plaintiff that she was not to ever talk to or confront Defendant Verdi again, or else she would be fired.

133.    Upon information and belief, Defendant Verdi was upset that Plaintiff had confronted him about the harassment and was now explicitly threatening to fire her.

134.    Plaintiff felt helpless, scared, and humiliated. She could not believe that her job was being threatened because she had tried to confront Defendant Verdi about his relentless harassment.

## Plaintiff is Terminated

135.    At the end of the day, on or around March 20, 2020, Coworker Reyes told Plaintiff that the construction site was closing due to COVID-19 and that she should take all

of her belongings with her. Coworker Reyes said that she could come back to work in two weeks.

136.     Plaintiff asked if she could leave some of her belongings behind, since she was coming back in two weeks, but Coworker Reyes said that Defendant Verdi wanted her to take all of her belongings with her.

137.     Shortly thereafter, Plaintiff's coworkers were called back to work, but she was not.

### Plaintiff was Not Paid an Equal Wage

138.     Upon information and belief, Plaintiff was paid less than her male  coworkers who performed equal or substantially similar work requiring equal or substantially similar skill and effort under similar working conditions.

139.     All of the employees who worked on framing at Defendants' site performed the same tasks. Defendants took care to conceal employees' pay rates by delivering their pay by hand in sealed envelopes for each pay period.

### Plaintiff was Not Paid an Equal Wage

140.     Plaintiff was employed from in or around December 2019 until in or around March 20, 2020, by Defendants.

141.     Plaintiff was paid by Defendants approximately $20.00 per hour throughout her employment from in or around December 2019 until in or around March 20, 2020.

142.     Plaintiff worked approximately forty-two and a half (42.5) to Fifty and a half (50.5) hours or more per week throughout her employment by Defendants from in or around December 2019 until in or around March 20, 2020. She always worked nine hours a day with a thirty-minute lunch break 5 days a week and at least every other week she was also forced

to work a nine-hour day with a thirty-minute lunch break on Saturday.

143.     Although Plaintiff worked approximately forty-two to 50.5 hours or more per week during her employment by Defendants throughout her employment, Defendants did not pay Plaintiff time and a half (1.5) for hours worked over forty (40), a blatant violation of the overtime provisions contained in the NYLL.

144.     Upon information and belief, Defendants willfully failed to post notices of the minimum wage and overtime wage requirements in a conspicuous place at the location of their employment as required by the NYLL.

145.     Upon information and belief, Defendants willfully failed to keep payroll records as required by the NYLL.

146.     As a result of these violations of New York State labor laws, Plaintiff seeks compensatory damages and liquidated damages in an amount exceeding $100,000.00. Plaintiff also seeks interest, attorneys' fees, costs, and all other legal and equitable remedies this Court deems appropriate.

## AS AND FOR THE FIRST CAUSE OF ACTION
*Sex/Gender Discrimination and Sexual Harassment in Violation of the NYSHRL and NYCHRL*
*Against All Defendants And in Violation of Title VII Against Defendants IBX and Bolex*

147.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

148.     Plaintiff was discriminated against, directly or by aiding and abetting, in the terms and conditions of her employment because of her sex in violation of Title VII, the New York State Human Rights Law, and the New York City Human Rights Law

149.     Plaintiff is a woman, and therefore is a member of a protected class. Plaintiff was qualified to work at Defendants. She satisfactorily performed the duties required by her

position.

150. Defendants intentionally subjected Plaintiff to a hostile work environment based on her gender by allowing a sexual harassing work environment where Plaintiff was sexually harassed by her supervisor. Defendants further intentionally subjected Plaintiff to a hostile work environment based on her gender by treating her less well than male employees.

151. As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income, including, but not limited to wages, social security, and other benefits due to her.

152. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

153. Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's Federal-law, State-law and City-law protected rights.

154. Based on Defendants' discrimination, Plaintiff is entitled to all remedies in violation of Title VII, the NYSHRL, and the NYCHRL against all Defendants. Plaintiff shall seek attorney's fees and punitive damages.

### AS AND FOR THE SECOND CAUSE OF ACTION
*Retaliation in Violation of the NYSHR, and NYCHRL Against All Defendants*
*And in Violation of Title VII Against Defendants IBX and Bolex*

155. Plaintiff repeats and realleges the allegations contained in the paragraphs

above as if separately set forth herein.

156.     Plaintiff objected to and complained to Defendants IBX and Verdi about the discrimination that she was subjected to during her employment, and they ignored and discouraged her complaints.

157.     Defendants Bolex and Babakhanov had actual knowledge that Plaintiff was subjected to discrimination and knew that they had a duty to correct it, and had actual or other knowledge that she complained of that discrimination and acquiesced in ignoring her complaints and/or aided and abetted the rejection of her complaints by Defendants IBX and Verdi.

158.     Defendants, unlawfully and without cause, retaliated against Plaintiff, directly or by aiding and abetting, as a direct result of Plaintiff complaining about the incidents of gender discrimination and sexual harassment.

159.     Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

160.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, a demotion and termination of Plaintiff's employment.

161.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

162.     As a result of Defendants' conduct alleged herein, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

24

163.     Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

164.     As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

165.     By reason of Defendants' discriminatory retaliation, Plaintiff is entitled to all remedies available for violations of Title VII, the NYSHRL, and the NYCHRL. Plaintiff shall seek attorney's fees and punitive damages.

**<u>AS AND FOR THE THIRD CAUSE OF ACTION</u>**
*Unequal Pay in Violation of the New York State Equal Pay Act,*
*NYLL Labor Law §§ §§ 194, 198 Against All Defendants*

166.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

167.     At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of the New York Labor Law, New York State Equal Pay law.

168.     The acts and practices of Defendants constitute discrimination against Plaintiff in violation of the New York Labor Law, New York State Equal Pay law by unlawfully paying female employees less than male employees for equal work.

169.     Defendants' violations of the New York Labor Law, New York State Equal Pay law were willful, entitling Plaintiff to all available damages, including statutory

25

liquidated damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*Overtime Wages Under the New York Labor Law Against All Defendants*

170.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

171.     At all times relevant to this action, Plaintiff was employed by Defendants within the meaning of New York Labor Law §§652 and 651.

172.     Defendants failed to pay Plaintiff overtime wages for hours worked in excess of forty hours per week at a wage rate of one and a half (1.5) times the regular wage to which Plaintiff was entitled to under New York Labor Law §652, in violation of 12 N.Y.C.R.R. 137-1.3.

173.     Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants, her unpaid overtime wages and an amount equal to her unpaid overtime wages in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including prejudgment interest in accordance with NY Labor Law.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*Violation of the Notice and Record Keeping Requirements*
*of the New York Labor Law Against All Defendants*

174.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

175.     Defendants failed to provide Plaintiff with a written notice of her rate of pay, regular pay day, and such other information as required by NYLL §195(1).

176.     Defendants are liable to Plaintiff in the amount of $5,000.00, together with costs and attorneys' fees.

## <u>AS AND FOR THE SIXTH CAUSE OF ACTION</u>
*Violation of the Wage Statement Requirements of the*
*New York Labor Law Against All Defendants*

177.    Plaintiff repeats and realleges the allegations contained in the paragraphs

above as if separately set forth herein.

178.    Defendants failed to provide Plaintiff with wage statements upon each

payment of wages, as required by NYLL §195(3).

179.    Defendants are liable to Plaintiff in the amount of $5,000.00, together with

costs and attorneys' fees.


**WHEREFORE**, the Plaintiff respectfully requests judgment:

a.  Declaring that the Defendants engaged in unlawful discrimination, unequal pay and
    retaliation in violation of the Federal, State, and City statutes cited herein;

b.  Declaring Defendants' conduct complained herein to be in violation of the
    Plaintiffs' rights under the New York Labor Law, and its regulations;

c.  Awarding overtime, compensatory, punitive and liquidated damages;

d.  Awarding Plaintiff prejudgment and post-judgment interest;

e.  Awarding the cost, disbursements and legal fees of this action, interest from the
    date of the verdict rendered hereon and reasonable attorney's fees.

f.  Granting such other and further relief as this Court may deem just and proper under
    the circumstances.


Dated: New York, New York
August 18, 2023

Respectfully submitted,

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: */s/ Rachel R. Feingold*
Rachel R. Feingold, Esq.

27

Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: 646-964-1178
Fax: 212-208-2914
Rachel@goddardlawnyc.com
Megan@goddardlawnyc.com